IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO TEACHERS UNION, LOCAL 1, AMERICAN FEDERATION OF TEACHERS, AFL-CIO; DONALD L. GARRETT JR.; ROBERT GREEN; and VIVONELL BROWN, JR., individually and on behalf of all similarly situated persons, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 12 C 10311 |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO and BARBARA BYRD-BENNETT, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case, three Chicago public school teachers and Chicago Teachers Union, Local 1 ("CTU"), have sued the Board of Education of the City of Chicago ("Board") and Barbara Byrd-Bennett, the president of the Board, alleging race discrimination in connection with the Board's termination of teachers assigned to "turnaround" schools. The defendants have answered the individual plaintiffs' claims but have moved to dismiss CTU's claims for lack of standing. For the reasons stated below, the Court denies defendants' motion.

**Facts**

On February 22, 2012, the Board announced that ten schools would be "turned around" or "reconstituted," a procedure that involves replacement and reassignment of all the teachers at the school. CTU and three teachers, all of whom are African-American, later filed suit. They seek to represent a class of all African-American teachers and paraprofessional staff in schools subjected to turnaround or reconstitution on or after the 2012 school year. They allege that

1

schools that have been selected for turnaround or reconstitution have a disproportionately higher percentage of African-American teachers than other schools and that the Board's practice regarding turnaround schools has had a discriminatory impact on African-American teachers. CTU asks the court to order the reinstatement of the class members to their former positions or substantially equivalent positions, or to award them front pay and benefits in lieu of reinstatement.

The Board has moved to dismiss CTU's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing. The Board argues that CTU lacks standing to pursue the present claims on behalf of its affected members.

## Discussion

To meet the "case or controversy" standing requirement of Article III, Section 2 of the Constitution, a plaintiff must establish a cognizable injury that is causally related to the alleged conduct of the defendant and redressable by judicial action. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). An association may satisfy these requirements by asserting claims that arise from injuries it sustained itself. *See, e.g., Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 299 n. 11 (1979). In this case, however, CTU does not contend that it has suffered any injuries. Rather, it is suing as a representative of its injured members. An association may establish standing to bring a lawsuit as a representative of its members if (1) the members would otherwise have standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members of the association in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Seventh Circuit has identified two types of standing challenges that a defendant may assert under Rule 12(b)(1): "facial" challenges and "factual" challenges. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009). A facial challenge concerns

only the adequacy of the plaintiff's pleading of standing.  *Id.*  A factual challenge is one in which the complaint may be formally sufficient to allege standing, but the defendant argues that standing is, in fact, lacking.  *Id.* at 444.  When a defendant asserts a factual challenge to standing, the Court may look beyond the complaint's allegations and consider any evidence the parties have submitted on the issue.  *Id.*  Once the defendant has offered evidence of the plaintiff's lack of standing, the presumption of correctness that a court normally accords to a complaint's factual allegations falls away, and "the plaintiff bears the burden of coming forward with competent proof that standing exists."  *Id.*  In this case, the Board has asserted a factual challenge to CTU's standing.

The parties do not dispute that CTU satisfies the first element of the *Hunt* test for associational standing.  The Board argues, however, that CTU fails to satisfy the second element of the *Hunt* test.  The Board contends that a conflict of interest exists between the members of the putative class – African American teachers who were displaced during school turnarounds – and non-African American CTU members, some of whom the Board contends would themselves be displaced were CTU to succeed in obtaining a court order reinstating the African-American class members.  The Board argues that due to this conflict of interest, the litigation is not germane to CTU's purposes, and thus it fails the second element of the *Hunt* test.

The Seventh Circuit has held that an association fails to meet *Hunt's* "germaneness" test if the litigation gives rise to a serious conflict of interest between the organization and its members. *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 863 (7th Cir. 1996) ("*RCPA II*") (citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1381 (7th Cir. 1987)).  A "profound" conflict of interest that may defeat organizational standing "arises where the association's suit, if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized." *RCPA II,* 76 F.3d at 864.  "These concerns are allayed," however, if the litigation was properly

3

authorized in accordance with the association's internal procedures. *Id.* at 865. If that has taken place, "the membership has affirmed that the detriment to some members' interests does not render the litigation outside the germane interests of (the) association," and the court can be assured that the association will be "an effective representative." *Id.*

The Board contends that the injunctive relief sought by CTU – reinstatement of displaced African-American class members in their previous or equivalent positions – would cause a direct detriment to the interests of CTU members who are not members of the putative class. First, the Board contends that CTU members who have taken over the positions formerly held by the displaced teachers would themselves be displaced or laid off if the class members were reinstated. Second, the Board contends that the reinstatement of the class members would detrimentally impact the seniority of other current CTU members who would fall back further in the seniority queue. Third, the Board contends that successful litigation would result in African-American teachers receiving "preferential treatment" in rehiring decisions irrespective of their seniority or other relevant factors.

The Court begins with the Board's argument that plaintiffs' request for reinstatement of the class members would cause harm to other CTU members who now hold the positions to which the class members would be reinstated. CTU argues that even if reinstatement posed a conflict of interest as the Board contends, CTU is seeking for class members the alternative remedy of front pay and benefits, which would avoid any question of displacing other CTU members. This does not provide CTU with a way around the problem. The remedy of front pay would require the individual participation of class members, which would run afoul of the third element of the *Hunt* test. *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 923 (7th Cir. 1995). An association cannot sue on behalf of its members when a claim for monetary relief is involved. *Id; see also, Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.*, 540 F.2d 864, 865 (7th Cir. 1976).

4

Thus the Court must deal directly with the Board's argument that plaintiffs' request for reinstatement of class members to their previous or equivalent positions would lead to layoffs of CTU members who are currently teachers and thus create a significant conflict of interest on the part of the union. CTU disputes this, pointing to a list of about 400 open teaching positions. This is more than enough, CTU argues, to provide alternative positions for every class members without any need to displace other CTU members.

With its reply brief, the has Board submitted an affidavit from a "workforce planning manager" in its human resources department to support its contention that success by CTU in this case would cause harm to some of the union's members. The Board's affiant, Lauren Clair-McClellan, states that 339 tenured teachers from "reconstituted" schools were reassigned in 2012. Of these, 142 were African-American. If these teachers were ordered to be reinstated, Ms. Clair-McClellan states, this "would force the board to layoff current CPS teachers in order to create available CPS positions for the teachers previously reassigned. The Board cannot open more teacher positions in the same schools due to budget constraints." Clair-McClellan Affid. ¶ 6. Ms. Clair-McClellan states that of the 402 open teacher positions identified on the list submitted by plaintiffs, many require specific qualifications. She identifies, in particular, thirty positions for bilingual teachers and 116 for special education teachers. *Id.* ¶¶ *7-8.* Ms. Clair-McClellan also notes that some of the positions on the list require certifications for particular grade levels, though she does not say how many. *Id.* ¶ 10.

The evidence submitted by the Board is insufficient to call CTU's standing into question. First, as CTU points out, the relief it requests is reinstatement of the putative class members into their former positions *or equivalent positions.* Thus the requested relief would not require displacement of the CTU members who took over the plaintiffs' teaching positions. Second, on the current record, the Board's contention that a win by the putative class would require layoffs of current CTU teachers to create available alternative positions for the class members is speculative. According to Ms. Clair-McClellan's affidavit, there are about 140 members of the

putative class. The list of open positions offered by CTU identifies about 400 open teaching positions. Even if one takes at face value Ms. Clair-McClellan's statement that some of these positions require particularized qualifications, given the figures she has offered, the record indicates that there would be enough open positions to enable reinstatement into "equivalent" positions without displacing any other teachers. Specifically, Ms. Clair-McClellan identifies about 145 positions as requiring certification as a bilingual teacher or a special education teacher, but that would still leave over 250 open positions, more than enough. Even if, as Ms. Clair-McClellan states, some of the remaining open positions require certifications for particular grade levels, the factual material in her affidavit, which is not terribly specific, does not support her statement that there would not be enough positions that would fit the putative class members such that layoffs of other teachers would be required. The Court finds that on the current record, CTU has established by competent proof that it has no serious conflict of interest.

  The Board also argues that reinstatement of the putative class members would disadvantage other CTU members in terms of seniority. It appears to be undisputed, however, that no current teacher's seniority status would be affected. Rather, the alleged detriment is that some reinstated teachers would get back into the seniority line ahead of other current CTU teachers. Though it may well be in the best interest of currently employed CTU members to have fewer co-members with greater seniority, it is difficult to describe that detriment as the sort of profound conflict that would defeat associational standing under *RCPA II*, particularly given the relatively modest number of class members as compared with the overall membership of CTU.

  The Board's "preferential treatment" argument is little more than a repackaging of its other contentions. The Court rejects that argument for the reasons already noted.

  Because the Court has concluded that the evidence does not indicate a serious or profound conflict of interest of the type that would defeat the Union's ability to establish associational

standing, the Court need not reach the question of whether there is some other alternative short of dismissal for lack of standing. The Court notes, however, that the number of open and available positions may not remain constant throughout the lawsuit, and further factual development may reveal that fewer positions are actually available to the putative class members. And as the Seventh Circuit has indicated, the question of antagonistic and conflicting interests may also become an issue if and when the lawsuit reaches the class certification stage. *See, e.g., RCPA II*, 76 F.3d at 864; *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) ("*RCPA I*"). With this in mind, the Court observes that CTU would be well advised to take, now, the steps necessary to seek the sort of internal authorization that *RCPA II* indicates would overcome a conflict of interest claim, at least for standing purposes.

### Conclusion

For the reasons stated above, the Court denies defendants' motion to dismiss the claims of plaintiff Chicago Teachers Union [docket no. 27].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 2, 2013