# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHICAGO TEACHERS UNION, LOCAL 1,  )
AMERICAN FEDERATION OF TEACHERS,  )
AFL-CIO; DONALD J. GARRETT JR.;  )
ROBERT GREEN; and VIVONELL BROWN,  )
JR., individually and on behalf of all similarly  )
situated persons,  )
  )
      Plaintiffs,  )
  )    No. 12 C 10311
    v.  )
  )    Judge Sara L. Ellis
BOARD OF EDUCATION OF THE CITY  )
OF CHICAGO, a body politic and corporate,  )
  )
      Defendant.  )

## OPINION AND ORDER

On February 22, 2012, the Board of Education of the City of Chicago (the "Board")

announced that ten schools would be "turned around" or "reconstituted," a process that involves

replacing all teachers and staff at those schools. Plaintiffs Donald J. Garrett Jr., Robert Green,

and Vivonell Brown, Jr., three African American tenured teachers affected by the turnarounds

and the Chicago Teachers Union, Local 1 ("CTU"), filed suit against the Board, alleging that the

Board's decision to turn around these ten schools was racially discriminatory. Plaintiffs seek to

certify the following class:

> All African American persons employed by the Board of
> Education of the City of Chicago as a teacher or para-professional
> staff, as defined in the labor agreement between the Chicago
> Teachers Union and the Board of Education, in any school or
> attendance center subjected to reconstitution, or "turnaround," on
> or after the 2012 calendar year.

Doc. 63 at 2. They seek certification under Federal Rule of Civil Procedure 23(b)(2), (b)(3), or,

alternatively (c)(4). Because commonality is lacking and, even if it was found, certification

would not be appropriate under Rule 23(b)(2), (b)(3), or (c)(4), Plaintiffs' motion for class certification [63] is denied.

## BACKGROUND

The Illinois School Code, 105 Ill. Comp. Stat. 5/34-8.3(d), provides that schools may be subject to turn around if they have been on probation for at least one year and have failed to make adequate progress in correcting deficiencies. In a turnaround, the Board relieves the Local School Council ("LSC") of certain tasks and removes all staff. The Board then either contracts with a third party, such as the Academy for Urban School Leadership ("AUSL"), to run the school or assigns the school to the Board's Office of School Improvement ("OSI") or its geographic network for restaffing. Pursuant to the collective bargaining agreement ("CBA") between the CTU and the Board, affected tenured teachers are placed in a reassigned teacher pool where they continue to receive a full salary and benefits for one school year. If a tenured teacher does not find a permanent position during that year, he or she is thereafter honorably terminated unless his or her time in the pool is extended. Probationary appointed teachers ("PATs"), other teachers, and para-professionals are not placed in the reassigned teacher pool. Teachers ineligible for the reassigned teacher pool and teachers honorably terminated after one year may be placed in the cadre pool, where they receive substitute assignments for which they are paid per assignment. Teachers in the cadre pool continue to receive health benefits for one year and are paid at a higher rate than those in the day-to-day substitute pool.

Between 2004 and 2011, sixteen schools within the Chicago Public Schools ("CPS") were turned around. In fall 2011, the Board began considering which schools should be turned around, closed, phased-out, and co-located in 2012. This process was led by Oliver Sicat, who at the time, was in charge of CPS' portfolio office. The CPS CEO made the decision as to which

schools should be recommended for turnaround to the Board, with the Board having the final say.

The 2012 turnaround process started with an initial list of 226 schools. Schools with a composite ISAT score above the network average for elementary schools or a five-year graduation rate above the network average for high schools were then removed, leaving approximately 74 schools on the list. A qualitative, "in-depth investigation process" of these 74 schools followed, involving school visits and additional data collection. Pl.'s Ex. A-10 at 13. Additionally, meetings were held with network chiefs,[1] representatives from other Board departments, community members, and other stakeholders interested in the proposed turnarounds.

According to Ryan Crosby, currently the Director of Performance Data and Policy in the CPS' Office of Accountability and at the time of the turnaround decisions, a Manager of School Performance, no written policy applied to the turnaround decision and no one set of factors was used to determine whether turnaround was appropriate for a particular school. Pl.'s Ex. A, Crosby Dep. Tr. 28:15–20. Nonetheless, certain factors played a role, including "the academic culture of the school, whether or not quality instruction was being provided, whether or not there was good leadership in the school, . . . the academic trends of the school, the quality of implementation of programs that were in existence."[2] *Id.* 28:20–25. But in considering whether to turn around a school, an individual employee's performance ratings, years of service, or the performance of students in a teacher's individual classroom were not taken into account.

---

[1] At the time of the turnaround at issue here, CPS was divided into nineteen geographic networks, each supervised by a "Chief of Schools" or "Network Chief."

[2] A school's academic trends were measured by its performance score, referred to as its PPI. The PPI is calculated by considering, among other things, standardized test scores, school attendance rates, academic progress, and improvement over time in comparison with other schools in the same geographic network. For high schools, the dropout rate, Freshmen on Track rate, and success in advanced placement programs are also included in the PPI.

Ultimately, ten schools—eight elementary schools and two high schools—were selected for turnaround. The schools being recommended for turnaround were presented to the Board in a February 2012 briefing, which discussed not only turnarounds but also school closures, phase-outs, and co-locations. The briefing set forth in detail the rationale for why each school was selected for turnaround, listing among other things, the level of performance, the utilization level, the number of years the school had been on probation, and its PPI score. The geographic network and a map denoting the location of the school and its performance level and utilization in comparison to other schools in the same area were also included. Certain schools received more detailed attention. For example, Casals, which was considered a "priority" school, was slated for turnaround because it had overall low performance with students growing at a slower pace than similar students at other schools despite having received multiple supports over its five years on probation. The briefing also set forth CPS' response to community feedback it had received in opposition to the proposed turnaround at Casals. After receiving and reviewing this information, the Board voted to turn around the ten schools on February 22, 2012. All affected teachers and staff were then notified that their schools were being turned around. On June 30, 2012, they were terminated from their positions at those schools.

The schools that were turned around in 2012 were located exclusively on the south and west sides of Chicago, where African Americans make up 40.9% of tenured teachers. No schools were selected for turnaround on the north side, where only 6.5% of the tenured teachers are African American. The racial demographics of the employee population varied at each of the schools at issue, however, with the percentage of African American employees at each as follows: Smith (88.6%); Woodson (85%); Stagg (83.7%); Fuller (81%); Herzl (75.6%); Chicago Vocational High School (75%); Tilden (57.4%); Piccolo (39.1%); Marquette (26.7%); and

Casals (26.7%). If looking solely at teachers, the percentage of African American teachers was below 50% at four of the schools: Casals (20.7%); Marquette (21.4%), Piccolo (32.3%); and Tilden (48.6%). The total percentage of African American tenured teachers at the ten schools was approximately 51%, although as of February 8, 2013, African Americans made up only 27% of the total population of CPS tenured teachers.

The proposed class consists of 32 African American para-professionals, 11 African American PATs, 163 African American tenured teachers, and 7 African American teachers with no tenure status.[3] According to the Board's records, of the 163 tenured teachers, 122 are current full-time Board employees,[4] 1 is retired, 3 are on leaves of absence, 8 are part of the cadre pool, 6 are day-to-day substitutes, and 23 are no longer employed by the Board. Of the 11 PATs, 7 are current full-time Board employees and the remaining 4 are no longer employed by the Board. Of the 7 teachers with no tenure status, only 2 remain full-time Board employees. Half of the para-professionals remain employed full-time by the Board. Of all tenured teachers who entered the reassigned teacher pool in 2012, 61.5% were rehired. Of those African American tenured teachers displaced by the turnaround process in 2012, 74.9% were rehired from the reassigned teacher pool.

With respect to the named Plaintiffs, Garrett, who previously worked at Tilden, was hired by Marshall High School in November 2012, losing no pay or benefits. Brown, who taught at Woodson, received an interim assignment but was not offered a permanent position and thus returned to the reassigned teacher pool. Pursuant to the terms of the CBA, he may remain in the reassigned teacher pool until April 30, 2014 while receiving full pay and benefits. Green was a

---

[3] Although Plaintiffs' opening memorandum included an additional 184 staff members as part of the putative class, *see* Doc. 63-1 at 5, Plaintiffs have clarified that they do not seek to represent these staff members, Doc. 83 at 3.

[4] The Board's classification of individuals as "full-time" includes those currently in the reassigned teacher pool.

tenured teacher at Chicago Vocational High School, although he held only a provisional

vocational teaching certification for auto body repair. After being placed in the reassigned

teacher pool, he did not apply for another position because there was not another open position

for which he was qualified at one of the three CPS schools with an auto body repair program.

## LEGAL STANDARD

A party seeking to certify a class must demonstrate that the four requirements of Rule

23(a)—numerosity, commonality, typicality, and adequacy of representation—are met. Fed. R.

Civ. P. 23(a). Additionally, the party seeking certification must show that one of the three

subsections of Rule 23(b) is met. Fed. R. Civ. P. 23(b); *Oshana v. Coca-Cola Co.*, 472 F.3d 506,

513 (7th Cir. 2006). Here, Plaintiffs seek certification under Rules 23(b)(2) and (b)(3). Rule

23(b)(2) requires a finding that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule

23(b)(3) requires a finding that "questions of law or fact common to class members predominate

over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3). Finally, although not an explicit requirement of Rule 23, the party seeking certification

must demonstrate that the class members are identifiable. *Oshana*, 472 F.3d at 513.

The Court has broad discretion in determining whether a proposed class should be

certified. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). The party seeking certification

bears the burden of demonstrating that certification is proper by a preponderance of the evidence.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The Court must

engage in a "rigorous analysis," resolving material factual disputes where necessary. *Wal-Mart*

*Stores, Inc. v. Dukes*, --- U.S. ----, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

## ANALYSIS

### I.      Rule 23(a) Requirements

#### A.      Numerosity

Rule 23(a) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, numerosity is deemed satisfied where the proposed class includes at least forty members. *See Swanson v. Am. Consumer Industries, Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006). Here, the proposed class is well over that number, consisting of 32 para-professionals, 11 PATs, 163 tenured teachers, and 7 teachers with no tenure status.

Nonetheless, the Board argues that the putative class does not meet the numerosity requirement, as the putative class members' current employment status should be taken into account. But this takes too narrow a view of the class definition, which does not limit the class to only those African American teachers or para-professionals who remain unemployed by the Board or employed only as substitute teachers. Instead, the class definition includes all teachers and para-professionals subjected to turnaround on or after the 2012 calendar year. There can be no dispute that the proposed class, with 213 members, is sufficient to meet the numerosity requirement.

#### B.      Commonality

Commonality requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As part of this showing, Plaintiffs must demonstrate that the putative class members suffered the same injury. *Dukes*, 131 S. Ct. at 2551. Here, Plaintiffs

contend that all class members suffered the same adverse action as a result of the turnaround policy—displacement. The Board does not contest this for purposes of commonality. Nonetheless, the existence of a common injury does not end the commonality inquiry for that common injury must arise from a "common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of litigation." (alteration in original) (citation omitted)). "[S]uperficial common questions—like . . . whether each class member 'suffered a violation of the same provision of law'—are not enough." *Jamie S. v. Milwaukee Public Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Dukes*, 131 S. Ct. at 2551).

Here, Plaintiffs have brought claims alleging both disparate treatment and disparate impact arising out of the Board's decision to turn around the ten schools at which the putative class members worked. The crux of the inquiry is the reason for the turnaround decisions, and whether Plaintiffs can proceed on their claims on a classwide basis thus depends on whether there is "some glue holding the alleged *reasons* for all those decisions together . . . [so] that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Dukes*, 131 S. Ct. at 2552.

In *Falcon*, the Supreme Court suggested that commonality in a pattern or practice case can be shown in one of two ways: (1) through evidence of a biased companywide evaluation procedure or (2) through significant proof of a general policy of discrimination that manifests itself in the same general fashion throughout the company. *Gen. Tel. Co. of Sw. v. Falcon*, 457

8

U.S. 147, 159 n.15, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Subsequent cases, including *Dukes*, have found commonality not to exist where the allegedly discriminatory policy is highly discretionary and plaintiffs do not identify a common way in which that discretion is exercised. *See Dukes*, 131 S. Ct. at 2554; *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896–98 (7th Cir. 2012) (reversing class certification where, as in *Dukes*, alleged discrimination resulted from acts of individual supervisors exercising independent discretion). But if a general policy that is enforced at the corporate level rather than by individual supervisors is claimed to be discriminatory, even if some discretion exists, commonality may be found. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488–91 (7th Cir. 2012) (allowing class certification for disparate impact claim challenging companywide practices that local managers had to follow); *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 114 (4th Cir. 2013) ("[E]ven in cases where the complaint alleges discretion, if there is also an allegation of a company-wide policy of discrimination, the putative class may still satisfy the commonality requirement for certification.").

Plaintiffs argue that this case is more like *McReynolds*, where companywide policies were alleged to cause discrimination, 672 F.3d at 488–91, than *Dukes* or *Bolden*, where no general policies were found and instead conditions at each independent store or site varied based on the supervisor involved, *Dukes*, 131 S. Ct. at 2554; *Bolden*, 688 F.3d at 896–98. Plaintiffs contend that the turnaround decisions were made by the CEO based on uniform guidelines, with the same criteria applied across the board to whittle down the list of eligible schools for turnaround to ten. Although the Board acknowledges that general guidelines were in fact used initially to form the initial list of schools under consideration for turnaround, it argues that once the list was reduced to 74 schools, the subsequent selection process was no longer objective but

9

rather took into account a number of subjective factors that were individualized for each school. This, according to the Board, turned the process into a qualitative one that requires a school-by-school analysis, destroying any potential commonality finding.

Having considered the evidence before it, the Court agrees with the Board that Plaintiffs have not met their burden of establishing a common issue by a preponderance of the evidence. The record does not suggest that a uniform policy was applied throughout the process, the examination of which would resolve each class member's claim. Although the formation of the initial list of 226 schools and even the shorter list of 74 could be determined based almost solely on metrics, the ultimate determination of the schools to be turned around was made after a "qualitative review," with inputs differing from school to school. *See* Pl.'s Ex. E at 6. The rationales provided in the briefing for the February 22, 2012 Board meeting for the schools selected for turnaround underscore that the decision was not based on uniform criteria but was instead individualized. *See* Def.'s Ex. 5 at 7–8, 47–56. For example, Casals was considered for turnaround because it was a feeder into Orr High School, tied into AUSL's cluster strategy, and had a culture of complacency with poor quality instruction. *Id.* at 7. Smith was selected for turnaround because the parents and LSC had demanded a better option for the school and had actually voted to fire Smith's principal. *Id.* at 8. Tilden High School was selected even though the guidelines did not apply to it, as it was a Level 2 school, but it nonetheless had been on probation for fifteen of the last sixteen years and had a principal who had recently left. *Id.* at 8. The turnaround decisions were also made based on input from various stakeholders, voices and opinions that differed depending on the school under consideration. *See id.* at 5 (listing parties consulted throughout process, including network chiefs, City Hall, CHA, CTA, parents, OMB, instructional and student support services, facilities and operations, and elected officials).

The Court thus could not resolve whether the Board's turnaround policy was discriminatory as applied to all class members "in one stroke," for it would have to examine the rationale behind the decision to turn around each of the ten schools and compare those reasons to the decisions not to pursue the remaining sixty-three schools that had been considered for turnaround. *Cf. Dukes*, 131 S. Ct. at 2553–54 (policy allowing discretion "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action"); *Jamie S.*, 668 F.3d at 497 (to bring individual claims together as a class, plaintiffs "must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims"). If the turnaround decision had instead been based solely on choosing the ten schools with the lowest PPI or some other objectively measurable criteria applied across the board, with no need to look further into how the criteria were applied to the individual schools, the Court could find a common issue. *See Healey v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 592 (finding commonality met where evidence showed that uniform policy existed that did not require Court to "delve into how [policy or practice] was used or applied to individual workers"). But because the record before the Court demonstrates that the turnaround policy, to the extent there was one, was not well-defined or uniformly applied, Plaintiffs' proposed class fails to meet the commonality requirement. The Court could end its inquiry here, but it will proceed to analyze the remaining requirements for purposes of completeness.

### C.     Typicality and Adequacy of Representation

To satisfy typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th

Cir. 2011). Typicality is determined with reference to a defendant's actions, not with respect to specific defenses a defendant may have against certain class members. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996). To satisfy the adequacy requirement, the class representative must possess the same interest as the class members and not have claims or interests that are antagonistic or conflicting with those of the class.[5] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Plaintiffs argue that typicality is met because all class members were treated identically in that all of them were displaced from their positions at the schools upon the turnaround decision. Defendants, however, claim that typicality is not met because the named Plaintiffs are all tenured teachers and thus have different interests in advancing their claims than in advancing those of the putative class members. This is also essentially the Board's argument as to adequacy of representation, the remaining Rule 23(a) requirement, and thus the Court will consider the two requirements together. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) ("[T]he requirement of typicality merges with the further requirement that the class representative 'will fairly and adequately protect the interests of the class.'" (quoting Fed. R. Civ. P. 23(a)(4))).

The Board argues that the three named Plaintiffs are not typical and not proper class representatives because the named Plaintiffs have different post-displacement rights and interests than non-tenured teachers and para-professionals. Plaintiffs respond that the existence of distinct post-displacement rights goes only to damages, not to whether the named Plaintiffs can adequately represent the class. But a named representative's interest in the requested relief is

---

[5] The adequacy inquiry also involves determining whether the proposed class counsel is adequate. *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). Defendants do not challenge this aspect of the adequacy inquiry and thus the Court need not further address it.

relevant to whether that representative is adequate to represent the entire class. *Arreola v. Godinez*, 546 F.3d 788, 799 (7th Cir. 2008) (finding plaintiff not to be an adequate representative for a class seeking to enjoin a policy where his interest in prospective relief was too tenuous); *see also Amchem*, 521 U.S. at 626 ("[F]or the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future."). Here, the different situations in which class members find themselves is evident just by looking at the three named Plaintiffs. Even though all three were tenured teachers, they are all currently differently situated and thus may have divergent interests in pursuing this litigation. For example, Garrett did not suffer any financial loss as a result of the 2012 turnaround decision, for he was placed in the reassignment pool and then appointed to a permanent position at Marshall High School, where he remains today. Thus, he does not appear to have any interest in the injunctive relief or damages being sought by the class. Brown has been in the reassignment pool since the turnaround decision was implemented and thus has to this point not suffered any financial loss or loss of benefits. But because he has not been rehired on a permanent basis, his interest in injunctive relief and damages remains. Green also has not found a permanent position and his status with the Board is not clear from the record before the Court.

In addition to being in different places today, the named Plaintiffs also have different rights under the CBA than non-tenured teachers and para-professional staff, which, according to the Board, creates a potential for conflict with the non-tenured teacher class members. *See McFadden v. Bd. of Educ. for Ill. Sch. Dist. U-46*, No. 05 C 0760, 2006 WL 681054, at *4 (N.D. Ill. Mar. 13, 2006) (potential for conflict of interest exists if named plaintiff "would be satisfied with a narrower remedy than that sought by the class"). But a conflict of interest must be more

than merely speculative or hypothetical to prevent the class representative from being found adequate. *See Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013) ("[T]his court has never held, and *Spano* did not imply, that the mere possibility that a trivial level of intra-class conflict may materialize as the litigation progresses forecloses class certification entirely."); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012). The Court at this stage is not convinced that any conflict between the named Plaintiffs and non-tenured teachers is more than speculative, with any potential conflict likely arising only at the damages stage. *See Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 680 (7th Cir. 2009) (denying class certification based on possible conflict over differences in class members' losses was premature). Thus, the Court would not find the named Plaintiffs inadequate or atypical at this stage to represent the class as to liability issues, though the case for adequacy and typicality would be stronger if there were additional named plaintiffs to account for the different staff classifications.

Finally, the Board argues that although the Court has found that CTU has associational standing, CTU nonetheless is not a proper class representative. The Board complains that CTU is not a member of the proposed class, as it is comprised of a minority of African American members. "While it is generally a requirement that the class representative be a member of the proposed class, this rule, for obvious reasons, does not typically apply to organizational representatives." *Nat'l Org. For Women, Inc. v. Scheidler*, 172 F.R.D. 351, 362 (N.D. Ill. 1997) (citations omitted). The Board also argues that CTU cannot be a class representative because it has suffered no injury. But the Court has already found CTU to have associational standing with respect to the injunctive claims in this action. Doc. 46. And while associational standing does not automatically render an association an appropriate class representative, the finding of

standing is sufficient as far as the need for an injury to allow CTU to serve as a class representative. *See Perdue v. Individual Members of Ind. State Bd. of Law Examiners*, 266 F.R.D. 215, 222 (S.D. Ind. 2010) (appointing ACLU, which had associational standing, as class representative); *Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, Inc.*, 204 F.R.D. 138, 147 (S.D. Ind. 2001) (rejecting argument that association was an inadequate class representative because it suffered no injury and had no real stake in the outcome), *vacated in part on other grounds by* 2005 WL 6957703 (S.D. Ind. Sept. 27, 2005). Without any valid objection to CTU's serving as a class representative, the Court finds that CTU would be an adequate class representative with respect to Plaintiffs' requests for injunctive relief.

## II.     Rule 23(b)(2)

Even if the Court found Rule 23(a)'s requirements satisfied, certification would not be appropriate under Rule 23(b)(2). A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 (citation omitted) (internal quotation marks omitted). Thus, a Rule 23(b)(2) class can only be certified if "a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* That relief must also be final as to the class as a whole. *Jamie S.*, 668 F.3d at 499. Claims for monetary relief are not appropriately certified under Rule 23(b)(2), unless they are incidental to the injunctive or declaratory relief. *Dukes*, 131 S. Ct. at 2557–58; *Johnson*, 702 F.3d at 369.

Plaintiffs seek a declaration that the Board's turnaround practice violated Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983; a moratorium on turnarounds; and an order reinstating class members to their pre-turnaround positions or substantially equivalent positions. The Board argues that there is no single injunction that can apply to all class members based on the differences in their current situations, with some in permanent teaching positions, others in the reassignment pool, and still others honorably discharged or otherwise situated. Moreover, they argue that such an injunction would not be possible given state law, which gives each principal the authority to hire teachers at his or her respective school. They maintain that any injunctive relief would have to be individualized, depending on a class member's certifications, a principal's desire to hire a putative class member, the desire of the class member to work at a particular school, and the Board's overall need for teachers and staff.

The Court agrees with the Board that the Plaintiffs' requests for injunctive and declaratory relief are not susceptible to certification under Rule 23(b)(2). "That the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final." *Jamie S.*, 668 F.3d at 499; *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) ("An injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability."). Although Plaintiffs' request for a declaration that the turnaround policy violates federal law would apply class-wide, it would merely be a prelude to further relief, which would be inherently individualized. *Boelk v. AT & T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 261265, at *13 (W.D. Wis. Jan. 10, 2013) (refusing to certify class

under Rule 23(b)(2) where requested declaration regarding the illegality of defendants' policies would only lay evidentiary foundation for subsequent liability determinations). There can be no single injunction that would provide final relief to the class as a whole; instead, as in *Jamie S.*, the injunction would have to establish a system for eventually providing individualized relief, either placing class members in specific jobs based on their qualifications and openings or providing them with back pay and front pay if no position was available. *See Jamie S.*, 668 F.3d at 499; *Kartman*, 634 F.3d at 893 n.8 ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate."). And as the Board points out, some class members, including Garrett, may not even benefit from the relief Plaintiffs are seeking, as they maintain full-time employment with the Board and have lost no pay or benefits as a result of the turnaround, also making certification under Rule 23(b)(2) inappropriate. *See Kartman*, 634 F.3d at 893 (noting that proposed injunction of class-wide roof reinspection would not serve any purpose for those class members who had already replaced their roofs). Nor would their request for a moratorium on future turnarounds provide final relief to the entire class, as such prospective relief is not tailored to address the injury the putative class members have allegedly suffered as a result of the 2012 turnaround decision—displacement from their jobs. Thus, certification is not appropriate under Rule 23(b)(2).

## III.    Rule 23(b)(3)

Similarly, the Court would not certify a class under Rule 23(b)(3) even if it found Rule 23(a) to be met. Rule 23(b)(3) allows for certification if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Board only challenges predominance, arguing that

individualized questions of liability and damages should preclude certification. The predominance requirement is satisfied when "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815 (alterations in original) (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). In other words, predominance is met where common evidence may be used to prove the class members' claims. *Id.* "Predominance is a qualitative rather than a quantitative concept." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). "It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Id.*

Assuming that the Court found a common issue, such as whether the Board had a uniform policy in selecting schools for turnaround, individual issues surrounding the turnaround selection process would nonetheless predominate. As discussed in connection with the commonality analysis, there were specific facts and issues as to why each of the ten schools was selected for turnaround in 2012. The selection process involved a qualitative review, and the Court would need to delve into how each of the ten schools was evaluated in comparison to the other schools considered but not selected. As claims would have to be resolved on a school-by-school basis, any efficiencies to be gained by certifying the class under Rule 23(b)(3) are destroyed.

Although individualized issues thus predominate, the Court notes that the fact that damages may be individualized in this case would not preclude certification. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members

can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."). The Board argues that the Supreme Court's decision in *Comcast v. Behrend*, --- U.S. ----, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013) changed the landscape, however, and requires that certification be denied because damages can only be determined on a case-by-case basis. But *Comcast* held that a "damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges." *Butler*, 727 F.3d at 799. In *Butler*, there was "no possibility . . . that damages could be attributed to the acts of the defendants that are not challenged on a class-wide basis." *Id.* at 800. Plaintiffs argue that similarly, the class members' damages all stem from the challenged turnaround policy. The Board points out that the damages of class members may vary depending on each member's position, qualifications, and available job opportunities after the turnaround. Despite these variations, all putative class members attribute their damages to the turnaround decisions. The extent to which they were able to mitigate their damages is individualized, but the Court is not persuaded that this case merits departure from the prevailing rule that individualized damage issues do not preclude class certification. *See id.* at 800–01 (noting that there may be differences that affected the severity of the problem that the class members in that case suffered but that differences in damages should not preclude certification where damages could be determined in individual hearings, settlement negotiations, or through creation of subclasses).

## IV. Rule 23(c)(4)

Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Because Plaintiffs

have not identified any common issues that can be resolved on a classwide basis, Rule 23(c)(4) does not come into play. *See Boelk*, 2013 WL 261265, at *14. But even if the Court had found a common issue, certification under Rule 23(c)(4) would not be appropriate.

"The district court is not obligated to grant partial certification if particular issues are common to a class." *Clark v. Experian Info. Solutions, Inc.*, 256 F. App'x 818, 822 (7th Cir. 2007). A finding of commonality does not automatically warrant certification; "Rule 23(b)(3)'s requirements of predominance and manageability are applicable to 'issue' certification" as well." *In re Yasmin & Yaz (Drospirenone) Mktg.*, 275 F.R.D. 270, 277 (S.D. Ill. 2011). Whether the predominance requirement applies to the individual issue or the case as a whole is an open question in the Seventh Circuit, *id.* at 277 n.12, but certification would not be appropriate here under either scenario.

Here, even were the Court to have found a common issue—whether the guidelines used by the Board in deciding to turn around the ten schools in 2012 were discriminatory—resolution of that issue is entangled with the individualized issues discussed above with regard to certification of the putative class as a whole. The ultimate question of liability must be answered by considering not only any overarching guidelines but also the specific factors that went into the decisionmaking process for each particular school. Because the Board has presented sufficient evidence to suggest that the decision for each school involved more than just general guidelines but also took into account additional qualitative factors that varied from school to school, these individualized issues predominate. Thus, as with the request to certify the class as to the claims as a whole, Plaintiffs' request for issue certification fails on manageability and predominance grounds. *See In re Yasmin*, 275 F.R.D. at 277–79 (declining to certify common issues under Rule 23(c)(4) where they were enmeshed with individual issues that precluded a finding of

predominance); *In re Fedex Ground Package Sys., Inc. Emp't Practices Litig.*, No. MDL-1700, 3:05-MD-527 RM, 2010 WL 1652863, at *2 (N.D. Ind. Apr. 21, 2010) (issue of whether prior court decision has collateral estoppel effect did not predominate over individual issues necessary to resolve plaintiffs' causes of action and its certification would not result in efficient adjudication of case); *Hamilton v. O'Connor Chevrolet, Inc.*, No. 02 C 1897, 2006 WL 1697171, at *6–9 (N.D. Ill. June 12, 2006) (refusing to certify issue class where proposed class issue of statutory interpretation would "settle little" and fact-specific inquiries predominated); *McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2006 WL 1476110, at *16 (N.D. Ill. May 23, 2006) (declining to certify issue classes because individual issues would predominate over common ones).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification [63] is denied.


Dated: May 27, 2014

                                                                                        SARA L. ELLIS
United States District Judge