**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TEACHERS UNION, LOCAL 1, et al. | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 12 C 10311, 15 C 8149 |
| v. | ) ) | |
| | ) | Judge Sara L. Ellis |
| BOARD OF EDUCATION OF THE CITY | ) | Magistrate Judge Young Kim |
| OF CHICAGO, a body politic and corporate, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S *DAUBERT* MOTION
TO STRIKE DR. JONATHAN WALKER'S OPINIONS**

Robin Potter, Esq.
Patrick Cowlin, Esq.
Potter Bolanos LLC
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
(312) 861-1800
robin@potterlaw.org
patrick@potterlaw.org

Counsel to the Plaintiffs

Randall D. Schmidt, Esq.
Edwin F. Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611
r-schmidt@uchicago.edu

Counsel to the Individual Plaintiffs

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Legal Standard ..................................................................................................... 2

Argument .............................................................................................................. 3

I.  Dr. Blanchflower's Belated Declaration Must Not Be Considered Because It Offers New Opinions and Testimony After the Close of Expert Discovery ............................................... 3

II.  Dr. Walker's Testimony in his First and Third Reports Should Not Be Excluded ............ 4

  a.  The Opinions in Dr. Walker's First and Third Reports Are Based on Reliable and Widely Accepted Methods That Are Pertinent to the Factual and Legal Framework of This Case  4

  b.  Dr. Walker Properly Analyzed the Adverse Impact on the Entire Certified Class ............. 8

  c.  The Board Misrepresented The Context and Conclusions of Dr. Walker's Hypothetical in His First Report ....................................................................................................... 13

III.  Dr. Walker's Opinions from His Second Report Should Not be Excluded ...................... 15

IV.  The Board's Arguments About Allegedly Omitted Variables and Data Are Relevant to Weight, Not Admissibility .................................................................................... 17

Conclusion ........................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Advanced Thermal Scis. Corp v. Applied Materials Inc.*, 2009 U.S. Dist. LEXIS 140818, 2009 WL 10673194, at *1 (C.D. Cal. Oct. 28, 2009) ...................................................................... 10

*Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531 (7th Cir. 2003) ............................ 13

*Amakua Dev. LLC v. Warner*, 2007 U.S. Dist. LEXIS 49952, 2007 WL 2028186 (N.D. Ill. July 10, 2007) ...................................................................................................................................... 10

*Association of Mexican American Educators v. State of California*, 937 F. Supp. 1397, 1410 (N.D. Cal. 1996) ............................................................................................................................ 8

*Bazemore v. Friday*, 478 U.S. 385 (1986) .................................................................................. 20

*Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ......................................... 19

*Carey v. Piphus*, 435 U.S. 247, 267 (1978) ................................................................................ 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............................... *passim*

*Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980) .............................................................. 11, 12

*Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888-93 (E.D. Wis. 2010) ................. 13

*Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir. 2005) ................................................................................................................................... 18

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 236 F. Supp. 2d 314, 340–41 (S.D.N.Y. 2002) ............................................................................................................................ 7

*Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-cv-99-bbc, 2016 U.S. Dist. LEXIS 11979, at *8-10 (W.D. Wis. Feb. 1, 2016) ........................................................................................................ 4

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977) ........................................... 7

*Kuemmerlein v. Board of Educ. of Madison Metropolitan School District*, 894 F.2d 257 (7th Cir. 1990) ...................................................................................................................................... 11, 12

*Lanza v. Postmaster Gen. of U.S.*, 570 F. App'x 236, 240 (3d Cir. 2014) ................................. 13

*Lorance v. AT &T Technologies, Inc.*, 490 U.S. 900 (1989) ....................................................... 11

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 805-10 (7th Cir. 2013) .................................. 19

*People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) ..................... 8

*Physicians Healthsource, Inc. v. Alma Lasers, Inc.*, 2014 U.S. Dist. LEXIS 162709, at *8-10 (N.D. Ill. Nov. 20, 2014) .......................................................................................................... 4

*Sansone v. Brennan*, 917 F. 3d 975 at 983-84 (7th Cir. 2019) ...................................................... 3

*Texas Department of Housing and Community Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507 (2015) ......................................................................................................................... 9

**Statutes**

Fed. R. Civ. P. 26 (a)(2)(B) .................................................................................................... 4, 18

Fed. R. Civ. P. 26(b)(4)(B) ........................................................................................................ 18

Fed. R. Civ. P. 37 .......................................................................................................................... 4

Fed. R. Evid. 702 .................................................................................................................... 2, 14

Fed. R. Evid. 703 ........................................................................................................................... 3

**Introduction**

Plaintiffs respectfully respond in opposition to Defendant Board of Education of the City of Chicago's ("Board") Motion to Exclude the Reports and Testimony of Dr. Jonathan Walker (Dkt. # 257-1) ("Motion"). The Board's Motion must be denied because Dr. Walker has conducted analyses that will assist the trier of fact in a statistically reliable manner, consistent with the law and facts of this case, including the definition of the certified class.

The Board's Motion highlights its continued refusal to recognize or even address Plaintiffs' legal and factual theories of this case. The reality is that the Board's policy and practice of using performance points and probation status to select schools for Turnaround caused a statistically significant disproportionate impact on African American CTU members from 2008 through 2014. Board Exhibits 1-3 (August 12, 2016; April 24, 2017; and May 24, 2018 Expert Reports of Dr. Walker). A school's performance points reflect the races of the students, teachers, and paraprofessionals in that school due to longstanding racial segregation within CPS. *Id.* The Board and Dr. Blanchflower do not dispute that the disparities exist. *See e.g.* Dkt. # 249-1 (Ex. A to Joint Motion Regarding Contested Facts, Statement of Facts for Summary Judgment) at ¶¶ 86-95, 100-107. As Plaintiffs set forth in their Motion to Exclude the Testimony of Dr. Blanchflower, the adverse impact does not, and cannot, disappear when controlling for academic performance (i.e. performance points), which is the facially neutral factor that lead to the impact. Dkt. # 259 at pp. 17-21 (Dr. Blanchflower's conclusions based on models controlling for performance points were "fallacious"). Moreover, Dr. Walker properly analyzed the adverse impact Turnarounds had on the entire certified class, members of which Plaintiffs and the Court have agreed suffered an adverse action when the Board terminated them from their positions at Turnaround schools. The Board also spilled much ink to take Dr. Walker's opinions out of the

context, attributed opinions to him that he did not articulate in his reports or deposition testimony, and misrepresented the facts and/or significance of various STATA operations. Dkt. # 257-1 at pp. 8-13, 17-21. Much of the Board's arguments are based on a new declaration from Dr. Blanchflower, which should be disregarded because it contains new analyses and opinions and was produced well after the close of discovery.

The Board's Motion is yet another attempt to fit an alternate legal and factual universe onto this case, this time in context of claiming Dr. Walker's testimony should be excluded. Dr. Walker's training, experience, and reliable methodology qualify him to testify in this matter under *Daubert* and the Federal Rules of Evidence. Dr. Walker has a Ph.D. in economics from MIT and has taken graduate level classes in labor economics and statistics. *See* Board Exhibits 1-3 (containing Dr. Walker's CV). He has previously conducted disparate impact analyses on behalf of the federal government, private corporations, and individuals, applying the same methodology to measure disparities here as economists routinely apply to measure disparities both within litigation and outside of it. *Id.* The Board's arguments to exclude Dr. Walker's testimony must be rejected because, contrary to the Motion, Dr. Walker's analyses and opinions properly apply the facts of this case, employ sound methods, and will assist the trier of fact.

## Legal Standard

The standard for admitting expert testimony is set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under *Daubert* and Fed. R. Evid. 702, a witness who is qualified as an expert is permitted to testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles

2

and methods to the facts of the case." Fed. R. Evid. 702; *See also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Additionally, an expert can only "rely on facts and data on which experts in [their] field reasonably rely." *Sansone v. Brennan*, 917 F. 3d 975 at 983-84 (7th Cir. 2019); Fed. R. Evid. 703.

## Argument

### I. Dr. Blanchflower's Belated Declaration Must Not Be Considered Because It Offers New Opinions and Testimony After the Close of Expert Discovery

The Board's Motion relies heavily on a new declaration from its proffered expert, Dr. Blanchflower. His declaration contains new analyses and new opinions regarding Dr. Walker's reports, going back to August of 2016. The Board, and Dr. Blanchflower, thus had ample time to disclose these new expert opinions as required by Fed. R. Civ. P. 26(a)(2)(B) before expert discovery closed on June 30, 2018. Dkt. ## 239, 241. Indeed, Dr. Blanchflower submitted a "rebuttal" expert report on October 9, 2017 and addressed Dr. Walker's work in his other reports but did not raise any of the analyses or opinions in the new declaration. Additionally, Dr. Blanchflower testified that his "rebuttal report" and other reports contained all of the opinions he intended to offer. Dkt. # 259-14 (Ex. 14 to Plaintiffs' Motion to Exclude Testimony of Dr. Walker, Blanchflower Dep.) at 523:6-524:21. Considering this new declaration would prejudice Plaintiffs because they do not have any opportunity to conduct discovery into the analyses and opinions it contains.

Courts have stricken similarly belated expert declarations. In *Haley v. Kolbe & Kolbe Millwork Co.*, 2016 U.S. Dist. LEXIS 11979, at *8-10 (W.D. Wis. Feb. 1, 2016) (striking expert's rebuttal declaration attached to *Daubert* motion because it offered new opinions in violation of the court's pretrial scheduling order); *Physicians Healthsource, Inc. v. Alma Lasers,*

3

*Inc.*, 2014 U.S. Dist. LEXIS 162709, at *8-10 (N.D. Ill. Nov. 20, 2014) (striking expert (Biggerstaff)'s declaration produced in conjunction with new evidence because allowing it would require reopening fact and expert discovery, re-deposing expert witnesses, and would prejudice the opposing party with no cure other than adding "months and more expenses to an already lengthy case"). The Court, therefore, should strike and/or disregard Dr. Blanchflower's declaration (essentially a new expert report), produced in abrogation of this Court's discovery orders and Fed. R. Civ. P. 26 (a)(2)(B). *See also* Fed. R. Civ. P. 37.

**II. Dr. Walker's Testimony in his First and Third Reports Should Not Be Excluded**

Contrary to the Board's Motion, the testimony contained in Dr. Walker's first and third reports (Exhibits 1 and 3 to the Board's Motion) is based on reliable statistical and econometric methods and properly apply the facts of the case. This is true even when considering the claims in Dr. Blanchflower's new declaration. Despite the Board's attempt to frame the issues otherwise, the Board's overarching criticisms are not actually methodological, they are legal, and must be rejected.

**a. The Opinions in Dr. Walker's First and Third Reports Are Based on Reliable and Widely Accepted Methods That Are Pertinent to the Factual and Legal Framework of This Case**

The Board, and its proffered expert, upon whom it relies heavily in its Motion, "seem to misunderstand entirely that the cause of the racial disparity is the use of the performance index" and "to include the performance index in the regression model would, of course, cancel out a separate supposed racially disparate effect." *See* Dkt. # 259 at pp. 17-21 (citing another of Plaintiffs' expert witnesses, Dr. Bruce Baker, whose testimony the Board has not moved to bar/exclude). Consistent with the Board's ongoing statistical misunderstanding, it now accuses

Dr. Walker of "omitted variable bias"[1] and using improper methods. These arguments must be rejected.

Indeed, the Board's omitted variable bias discussion is inapt and is irrelevant to the issues Dr. Walker addressed in this case. Omitted variable bias can arise when attempting to distinguish among causes for a disparity rather than the existence of a disparity at all. Omitted variable bias would therefore only be an issue if there was a reason to distinguish between disparate impact attributable to correlation between race and school performance and disparate impact due to other factors. In this case, the Board does not claim that it selected schools for probation and Turnaround for any other reason than schools' performance, as measured by its performance points system. Dr. Walker has provided a straightforward answer to a simple threshold question, "did the Board's facially neutral policy of using performance points and probation result in African American CTU Members being adversely impacted as compared to white and/or non-African Americans?" *See Griggs v. Duke Power*, 401 U.S. 424, 430-32 (1971). The answer is "yes," and so the disparate impact analysis moves to whether the Board's Turnaround selection process was job related and consistent with business necessity. *See id.*

The Board's Motion confuses this issue when it persistently claims that Dr. Walker's testimony is not useful to "infer causation." The causation question that the Board and Dr. Blanchflower raise, however, is whether race was a direct cause for the Board to select schools for Turnaround, not the proper question of whether its facially neutral policy caused a disparate impact. The Board's discussion of omitted variable bias therefore relates exclusively to potentially erroneous inferences about whether race was a direct cause of the disparate impact. Dr. Walker does not opine directly on that issue, so the Board's arguments in that regard do not

---

[1] Omitted Variable Bias occurs, generally, when a statistical model leave out one or more relevant variables.

support excluding any of his testimony.

The Board also claims that Dr. Walker's analyses have been rejected by his peers and cites passages from an econometrics textbook. Those textbook passages discuss how multiple regression may distinguish among different potential causes for a consequence and explain how omitted variable bias may afflict such multiple regression analyses. However, the passages to which the Board points do not pertain to the circumstances of this matter, where we are interested in knowing whether African-Americans were disproportionately impacted by the Board's facially neutral Turnaround selection metrics. The passages instead explicitly relate to inferences about direct causality that may be drawn from multiple regression models – inferences that an included variable (race) was the direct cause for the observed effect rather than the included variable being correlated with some other direct cause (school performance metrics), which, as discussed above, is not the relevant inquiry involved in the expert opinions the Board seeks to exclude. In short, "omitted variable bias" and "specification error" have nothing do with the calculation of correlation coefficients and the other statistical analyses Dr. Walker performed and the passages that the Board cites do not say otherwise.

Furthermore, Dr. Walker's opinions regarding the adverse impact on African American CTU members are consistent with relevant caselaw discussing what a plaintiff must show to establish adverse impact and/or a *prima facie* showing of a pattern or practice of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977) ("Proof of discriminatory motive, we have held, is not required under a disparate impact theory"); *Griggs v. Duke Power*, 401 U.S. at 430-32. In *Griggs*, the employer's requirement that employees have a high school diploma or pass an aptitude test violated Title VII because it disqualified significantly more blacks than whites. *Id.* The *Griggs* plaintiffs were not required to rule out other variables, such as

6

socio-economic status, or previous education to meet their burden on adverse impact because of the employer's clear diploma/test requirement. *Id.*

Similarly, in this matter, the Board does not dispute it selected schools based on performance points/probation status, so there is no reason or requirement to explore other "salient explanatory variables" to evaluate whether there was an adverse impact. *See id.*; *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 236 F. Supp. 2d 314, 340–41 (S.D.N.Y. 2002) ("there is no requirement that plaintiffs control for variables other than race and ethnicity in their statistical proof."); *Association of Mexican American Educators v. State of California*, 937 F. Supp. 1397, 1410 (N.D. Cal. 1996) (rejecting expert testimony because the expert analysis of other factors in explaining the disparate impact was irrelevant to the plaintiffs' claim.").

This case is not like the appellate court's decision regarding statistical analyses in *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) (upon which the Board relies). In that case, the court was tasked with evaluating whether continuing educational deficiencies of minority students in Rockford Public Schools was "due primarily" to *intentional* discrimination by school authorities. Because the court was evaluating intentional discrimination potentially caused by something as broad as the entire school district's general operation, it required statistical evidence to address all "salient" variables before considering it. *See id.* at 532-41. Thus, the statistics necessary to support the *People Who Care* plaintiffs' claims were a far cry from what is required in this matter, and the Board's reliance on that legal analysis does not apply to the disparate impact analyses that the Board seeks to exclude from Dr. Walker's reports. Moreover, the other "salient variable" the Board claims Dr. Walker should have controlled for is schools' student academic performance. As Plaintiffs explained in their Motion to Exclude the Testimony of Dr. Blanchflower, controlling for academic performance (i.e.,

7

performance points and the test scores that comprise the points) means controlling for the stated neutral reason for the adverse impact, which is not a statistically valid way to eliminate the statistical significance of the adverse impact on African Americans. Dkt. # 259 at pp. 17-21.

The Board also relies on *Texas Department of Housing and Community Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507 (2015). Such reliance is misplaced because it concerns the Fair Housing Act, rather than Title VII. *See id.* at 2523 (acknowledging that "the Title VII framework may not transfer exactly to the fair-housing context"). Moreover, in *Inclusive Communities*, the Supreme Court discussed disparate impact and the Fair Housing Act in general, noting that plaintiffs must be sure to identify a neutral policy or practice that caused an adverse impact (recognizing that housing location often involves many different decision points). *Id.* The Board's reliance on *Inclusive Communities* again conflates the "causation" requirement in disparate impact cases with its own idea that Dr. Walker was required to prove race was a direct cause of the adverse impact in this case, and therefore does not provide any basis to exclude Dr. Walker's testimony. As already discussed herein, Dr. Walker and both parties in this matter do not disagree that the Board's Turnaround selection process utilizing performance points and probation caused the statistically significant adverse impact on African Americans.

Contrary to the Board's Motion, Dr. Walker performed the analyses that are pertinent to this matter. The Board's attempt to shift the legal and factual framework of Plaintiffs' claims provide no bases to exclude Dr. Walker's testimony.

### b. Dr. Walker Properly Analyzed the Adverse Impact on the Entire Certified Class

Throughout this case, Plaintiffs have contended, and the Court has agreed, that the entire certified class suffered an adverse action when the Board terminated them from their positions at

8

Turnaround schools. *See* Dkt. # 259 at pp. 7-9 (citing Dec. 9, 2015 Transcript of Court Hearing, pp. 2-5 (finding that the Board took too narrow a view of the class definition and that "issues regarding class members' post-displacement rights were not a problem with respect to certification for liability purposes but, rather, issues to be addressed when dealing with damages")). Dr. Walker, therefore, did not merely adopt "Plaintiffs' litigation position," he applied the actual facts of the case when conducting his analyses. In doing so, Dr. Walker has provided useful information that will assist the trier of fact without usurping its role by imposing his own definition of an adverse employment action or by confusing the issue of damages with the issue of liability. Indeed, it is normal for an expert to offer opinions based on a legal framework that he receives from his client and the court. *See, e.g.*, *Advanced Thermal Scis. Corp v. Applied Materials Inc.*, 2009 U.S. Dist. LEXIS 140818, 2009 WL 10673194, at *1 (C.D. Cal. Oct. 28, 2009) ("The analysis of complex facts, albeit within a legal framework, is a proper role for an expert."). Otherwise, all opinion witnesses would also have to be legal experts. Admissibility becomes an issue when the expert purports to opine on whether the assumed framework is valid, as "expert's [sic] cannot testify regarding legal conclusions." *Amakua Dev. LLC v. Warner*, 2007 U.S. Dist. LEXIS 49952, 2007 WL 2028186 (N.D. Ill. July 10, 2007).

Furthermore, the Board's terminations of class members from their jobs in Turnaround schools were the adverse actions in this case as a matter of law because the terminations "triggered" the statute of limitations. *See Kuemmerlein v. Board of Educ. of Madison Metropolitan School District*, 894 F.2d 257 (7th Cir. 1990) (statute of limitations on a discrimination claim begins running upon a teacher's receipt of notice that she will lose her job, even when the school district has a practice of rehiring many teachers who receive such notice);

*see also Delaware State Coll. v. Ricks*[2], 449 U.S. 250 (1980) (Professor's time to file a discrimination action commenced when he was denied tenure and received a contract stating his employment would end at a later date; the only alleged discrimination occurred at the time the tenure decision was made and communicated); *accord Lorance v. AT &T Technologies, Inc.*, 490 U.S. 900 (1989) (time to file charge of discrimination commences when the discriminatory act occurred). Indeed, every class member had to apply for and be hired into a position if she wanted to work for the Board after the Turnarounds occurred. *See* Dkt. # 249- (Ex. A to Jt. Motion Regarding Contested Facts) ¶ 19. This was true regardless of any post-turnaround benefits the particular class member obtained (i.e., as a day-to-day substitute teacher, in the Reassigned Teachers' Pool, a Cadre substitute or, in the cases of paraprofessionals, simply laid off). *Id.*

*Kuemmerlein,* is analogous to this case. In *Kuemmerlein*, the plaintiffs received notices from the defendant that they would be laid off at the end of the school year. In prior years, they had also received layoff notices but had always been recalled before the start of the next school year. In the year at issue, however, they were not recalled. The issue before the Seventh Circuit was when did the statute of limitations begin to run: when the employees received the layoff notice or when they realized they were not going to be recalled? In *Kuemmerlein* the Seventh Circuit held:

> The *Ricks/Chardon* rule is clear: a cause of action for employment discrimination begins to run on the date of notice rather than the date of actual termination.

*Id* at 261*; see also Delaware State Coll. v. Ricks,* 449 U.S. 250 (1980). Accordingly, where, as here, a layoff/termination decision was definitively made and the statute of limitations begins to run, that action is an adverse employment action. When schools were selected for Turnaround, class members had no job as of that effective date, and that is classic adverse action.

_____

[2] Although *Kuemmerlein* and *Ricks* concern the running of the statute of limitations, they are controlling

Whether a particular class member was able to find new employment with the Board is only relevant for determining damages. As the Supreme Court has noted, even without proof of actual injury, plaintiffs are still entitled to recover nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 267 (1978) ("[I]f, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless will be entitled to recover nominal damages"). Thus, Plaintiffs can be – and, as they have repeatedly noted, *are* – members of the class even if their damages will only include nominal damages for the violation of their rights.

Finally, the cases the Board cited in its Motion regarding adverse employment actions are distinguishable from or inapplicable to the facts in this case. *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531 (7th Cir. 2003), concerned "[a]n unfulfilled threat," rather than a final decision that was made less painful by the employee's successful effort to reapply for her position or to seek out a new job. By relying on *Ajayi*, the Board is attempting to blur the distinction between adverse employment decisions that are merely contemplated and those that are already made, but with effects that may be ameliorated by some other, later decision. Unlike *Ajayi*, the Board's Turnarounds eliminated class members' positions once it made its final selection of Turnaround schools prior to the end of the 2011-2012 school year (and any other year Turnarounds occurred). *See id.*

Similarly, in *Lanza v. Postmaster Gen. of U.S.*, 570 F. App'x 236, 240 (3d Cir. 2014), the court specifically emphasized that the decision notice in question "held out only the possibility of discharge [and] provided avenues of appeal." That is a far cry from the unequivocal, final, and unappealable layoff decision class members here received when their schools were selected for Turnaround.

---

in this case because the running of a statute of limitation is "triggered" by "adverse action."

As explained above, Dr. Walker's methodology was based on sound reasoning – he did not ignore data as the Board accused when it cited to *Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888-93 (E.D. Wis. 2010). The analysis at issue in *Fail-Safe* is entirely distinguishable from Dr. Walker's analyses in this case. In *Fail-Safe*, an expert attempted to project the "market potential" for equipping pools and spas with safety devices. *Id.* The court ultimately found that the expert's starting point number for how many devices would be on the market was unreliable because the data was adopted wholesale from a single, undated PowerPoint slide and had not been independently verified before the witness opined on future sales. *Id.* Moreover, the court found that the expert's testimony was carefully tailored to support plaintiff's position, and for that reason he had "cherry picked" the data. *Id.* Lastly, by the time the expert's second report was released, his earlier prediction had been completely proven wrong. *Id.*

In the present case, Dr. Walker, in finding an adverse impact, did not adopt his starting point from a single, unverified source. Instead, he relied on the Board's own employee information and this court's definition of the class. *See* Board's Exhibits 1-3. Using this data as a starting point can hardly be described as lacking independent verification because the court itself has adopted the class definition. For the same reason, Dr. Walker did not ignore data in an attempt to carefully tailor it to support plaintiff's position: he used data that was carefully tailored to the court's definition of the class. Finally, Dr. Walker did not rely on data that was ultimately "completely proven wrong" at a later point. *Fail-Safe* is therefore not persuasive here.

In analyzing the entire certified class instead of a portion of it, Dr. Walker applied reliable statistical methods to the facts of this case to reach his conclusions, in accordance with Fed. R. Evid. 702. His testimony will therefore assist the trier of fact in determining whether the

12

Board's Turnarounds had an adverse impact on the class and in providing statistical evidence of a pattern or practice of discrimination. *Id.* The Board's Motion must therefore be denied.

### c. The Board Misrepresented The Context and Conclusions of Dr. Walker's Hypothetical in His First Report

In his first report, Dr. Walker set out a hypothetical turnaround selection process that was intentionally discriminatory against African American teachers and paraprofessionals, and then ran the statistical analyses Dr. Blanchflower utilized against those selections. Dr. Walker used the same data he and Dr. Blanchflower used in their reports in this analysis. The reason Dr. Walker conducted this analysis was to help explain why Dr. Blanchflower's overblown conclusions that the Board "did not discriminate" when it conducted Turnarounds did not make sense from an econometric/statistical point of view. Board Ex. 1 ¶¶ 54-58; *See* Dkt. # 259 (stating reasons such testimony from Dr. Blanchflower should be excluded). Contrary to the Board's motion, he did **not** offer the hypothetical to "try and meet Plaintiffs' burden," as it does not pertain to his finding that there was an adverse impact on African Americans. The Board's Motion fails to mention the actual context and purpose of his opinion, and instead engages in pages of misrepresentations and insults about it. The Board also does not dispute that the hypothetical does in fact rely on random numbers generated by STATA[3] or that it does yield statistically insignificant race coefficients when based upon those randomly selected numbers.

Moreover, Dr. Walker did not "carefully manipulate" or conceal anything. The whole point of the hypothetical was to explicitly select schools based on the race of teachers and paraprofessionals to show that, even in that extreme case, the "race" coefficient was not significant when also controlling for academic performance (as Dr. Blanchflower claims is the

---

[3] STATA is a statistical software package commonly used to conduct statistical analyses and otherwise analyze data. Dr. Walker and Dr. Blanchflower both utilized STATA in their work.

only way to analyze the data). As such, it shows that a statistically insignificant race coefficient does not prove the absence of discrimination in any form, as Dr. Blanchflower improperly concluded. Dr. Blanchflower's work showing that his statistical model may or may not generate a statistically significant race coefficient when it is applied to data that are generated by a race-based selection process merely corroborates that point. Dr. Walker explained his method and provided the underlying STATA files so that the Board could see every step of his work (though the Board improperly waited until now, three years later, and after the close of discovery, to contest this – *see supra.* Sec. I). It is non-sensical that the Board claims Dr. Walker did not produce something, yet also engages in what it claims to be a detailed analysis of what he did.

Moreover, the Board's obsession with "set seed 1776" reeks of conspiracy theory, because the Board, without any support, accuses Dr. Walker of intentionally manipulating data and code to reach his conclusion. In reality, STATA requires a random seed to generate random numbers, and the "set seed" command accomplishes that. If no seed is specified, i.e., the set seed command is omitted, STATA will default to the seed 123456789. Using the set seed makes work reproducible so that STATA will call up the same random sequence of numbers when the analysis is replicated. If Dr. Walker had not used the set seed command, then it would have been impossible for the Board to test his work. Also, if Dr. Blanchflower and the Board did not understand the command or how random number generators work, the Board could have asked Dr. Walker about it at his deposition, as it had possession of Dr. Walker's work beforehand. If the Board disagrees with the specific data Dr. Walker utilized, it is free to cross examine him with such information at trial and argue that this particular testimony should be afforded less weight. *See infra.* The Board's arguments regarding Dr. Walker's hypothetical are meritless, and that portion of his testimony should not be excluded.

14

### III. Dr. Walker's Opinions from His Second Report Should Not be Excluded

In his second report (Board Ex. 2), Dr. Walker found that Turnarounds the Board conducted from in 2008, 2009, and 2010 had an adverse impact on African American CTU members and that CPS schools were segregated in a way that the Board's Turnaround selection process would cause such an adverse impact. His conclusions are explained in his report and the numbers supporting his findings are reported in Figures I-XI. In its Motion, the Board only discusses Figures X and XI (which re-analyze Dr. Blanchflower's models), in yet another misrepresentation of Dr. Walker's work. Dr. Walker's findings support Plaintiffs' pattern or practice of discrimination claims, which Plaintiffs will explain in detail in their motion for summary judgment.

Figures X and XI of Dr. Walker's second report re-analyze the data using Dr. Blanchflower's (incorrect) assumption that only class members who eventually obtained other employment with the Board should be analyzed, and/or Dr. Blanchflower's own choice to control for extraneous variables the Board did not even consider when selecting schools for Turnaround. *See* Dkt. # 259. As such, while Figures X and XI still contain information supporting Dr. Walker's overall opinion, they are not a condition precedent to them – and the Board does not present any argument that Dr. Walker's report as a whole should be excluded.

Regardless, the Board's arguments related to Figures X and XI are meritless, because Dr. Walker re-did the analyses to correct any data that was "dropped" due to a STATA feature in the original report, and explained in his Declaration (Board Ex. 5) that the results did not change based on inclusion of such data.[4] Indeed, the Board's claim that the "ASIS" command in STATA re-used the characteristics of the 15% of data for the remaining 85% is not an accurate or

complete statement of how that command works. The STATA manual passage Dr. Blanchflower cites concerns cases where STATA literally fails to generate results as a result of the selection of certain observations (here the selection of certain CTU members for termination) is perfectly predicted by a variable (here being in schools with certain specific years of probation). It does not support his interpretation that dropping variables is preferred to dropping observations, let alone that dropping observations is unreliable. The passage merely states that there are two ways to force STATA to generate results. One way is to drop the observations that are perfectly predicted. The other is to drop the variable that is predicting them perfectly. STATA's default is the former. It does not say that one is preferred to the other. The STATA manual, therefore, does not support Dr. Blanchflower's position that STATA's default is methodologically improper, and he does not cite any other source that his preferred method is a "best practice."

Indeed, in a similar class action race discrimination case involving the Board's 2011 layoffs (Case No. 12-cv-10338, N.D. Ill.), Dr. Blanchflower submitted analyses in which STATA dropped many more observations than it dropped in the analyses that Dr. Blanchflower attacks here. *See* Ex. A (March 2, 2017 Blanchflower Layoffs Report) at Table 4(e) (dropping 13,608 to 16,315 observations); Ex. B (November 7, 2017 Blanchflower Layoffs Report) at Table 4 (same, submitted less than a month after opining in this matter that the best practice when a variable perfectly predicts the outcome for some observations is to drop the variable).

Finally, Dr. Walker did not "conceal" any results that contradicted the opinions he reached based on Tables X and XI. First, the analyses referenced by the Board were disclosed, otherwise the Board would not have them now. If the Board wanted to ask about these analyses at deposition it could have done so. Similarly, if it wants to ask at trial, it may do so. Second, Dr.

---

[4] Plaintiffs remind the Court that Dr. Blanchflower submitted three separate, full reports to correct errors in his initial submissions. Dkt. # 259 at pp. 1-4.

Walker did not rely on or consider these analyses to form his opinions because they contain variables that did not pertain to whether there was an adverse impact, and, as such, he was not required to discuss any of that information in his report. Fed. R. Civ. P. 26(a)(2)(B). If anything, the Board is the beneficiary of information to which it was not entitled. *See* Fed. R. Civ. P. 26(b)(4)(B) (explicitly exempting drafts from disclosure). Moreover, *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir. 2005) involved documents upon which an expert relied, but that were destroyed. It is plainly not applicable to this case.

At best, the Board's arguments related Dr. Walker's Tables X and XI go to weight, not admissibility. *See infra.* The Board's motion to exclude such testimony should be denied.

## IV. The Board's Arguments About Allegedly Omitted Variables and Data Are Relevant to Weight, Not Admissibility

In addition to the arguments set out herein, to the extent the Board's expert disagrees with Dr. Walker's variables and/or data, such questions go to the probative weight of his analyses, rather than to their admissibility. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 805-10 (7th Cir. 2013); *see Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). "The critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' [citation omitted] that is properly excluded" under Rule 702. *Id.* (quoting *GE v. Joiner*, 522 U.S. 136, 146 (1997)). All of Dr. Walker's analyses and resultant opinions are related to data from this case and his conclusions are supported with detailed reasoning in his

reports – none are unsupported statements based Dr. Walker's thoughts alone or an assertion

equivalent to "that is just the way it is." As such, all of the Board's arguments pertaining to

allegedly omitted variables or omitted/dropped data go the Board's argument against the weight

of such testimony, and do not constitute a basis to exclude it at this stage. *See Id.* ("the Supreme

Court and this Circuit have confirmed on a number of occasions that the selection of the

variables to include in a regression analysis is normally a question that goes to the probative

weight of the analysis rather than to its admissibility.") (citing *Bazemore v. Friday*, 478 U.S. 385

(1986)).

<u>**Conclusion**</u>

The Board's criticisms of Dr. Walker largely rely on its alternate legal theories in this

case. The fact is Dr. Walker's analyses and opinions that the Board seeks to exclude properly

apply the facts of this case, employ sound methods, and will assist the trier of fact. To the extent

the Board disagrees with the data and/or variables involved, it can argue the weight to which Dr.

Walker's testimony should be afforded.

**WHEREFORE**, Plaintiffs respectfully request that this Court strike and/or disregard Dr.

Blanchflower's declaration and deny the Board's Motion to Strike the Opinions Dr. Walker.

Respectfully Submitted,

 /s/ Patrick Cowlin
One of Plaintiffs' Attorneys

Robin Potter, Esq.
Patrick Cowlin, Esq.
Potter Bolanos LLC
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
312-861-1800
robin@potterlaw.org
patrick@potterlaw.org

Randall D. Schmidt, Esq.
Edwin F. Mandel Legal Aid Clinic
University of Chicago Law School
Attorney for the Individual Plaintiffs
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611
randall_schmidt@law.uchicago.edu

18

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 31, 2019 I electronically filed the foregoing **PLAINTIFFS' RESPONSE TO THE BOARD'S *DAUBERT* MOTION TO STRIKE DR. JONATHAN WALKER'S OPINIONS** with the Clerk of the Court using the CM/ECF system. All counsel of record for Defendants are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Patrick Cowlin
Patrick Cowlin

19